IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

KENNETH HORNE,
   Plaintiff,

vs.             Case No. 3:09cv194/MCR/EMT

MICHAEL J. ASTRUE,
Commissioner of Social Security,
   Defendant.
_____/

## REPORT AND RECOMMENDATION

  This case has been referred to the undersigned magistrate judge under the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D), and 72.3 of the Northern District of Florida pertaining to review of administrative determinations under the Social Security Act ("the Act") and related statutes, 42 U.S.C. § 401, *et seq.*  It is now before the court pursuant to 42 U.S.C. § 405(g) for review of a final determination of the Commissioner of Social Security ("the Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.

  Upon review of the record before this court, the undersigned concludes certain findings of fact and determinations of the Commissioner are not supported by substantial evidence or do not comport with proper legal principles.  The court therefore recommends that the decision of the Commissioner be reversed and remanded for further proceedings.

## I.     PROCEDURAL HISTORY

Plaintiff's application for DIB filed January 31, 2007 (*see* Tr. 102–06),[1] was denied initially and on reconsideration (*see* Tr. 63, 64).  At Plaintiff's request, an administrative law judge ("ALJ") conducted a hearing on June 24, 2008, in Dover, Delaware.  On September 10, 2008, the ALJ issued a decision finding that Plaintiff was not disabled (*see* Tr. 18–28).  The Appeals Council denied Plaintiff's request for review (*see* Tr.1–5).  Thus, the decision of the ALJ stands as the final decision of the Commissioner, now subject to review in this court.  Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007); Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998).  This appeal followed.

## II.    FINDINGS OF THE ALJ

In his decision denying Plaintiff's application for DIB,  the ALJ made the following findings:

1)    Plaintiff met the insured status requirements of the Act through March 31, 2007, his date last insured ("DLI").[2]

2)    Plaintiff has not engaged in substantial gainful activity since July 1, 2004, his alleged onset date.[3]

3)    During the period under consideration, Plaintiff had the severe impairments of thoracic and lumbar degenerative disc disease; left-sided carpal tunnel syndrome; and bilateral pes planus [flat feet].  Plaintiff also had the non-severe impairments of degenerative knee and hip conditions; sleep apnea; pancreatitis; hypertension; depression; and gastroesophageal reflux disease ("GERD").

4)    Plaintiff did not have an impairment or combination of impairments that meets or medically equals a listed impairment.

---

[1] All references to "Tr." refer to the transcript of Social Security Administration ("SSA") record filed on July 16, 2009 (Doc. 10).

[2] To be eligible to receive DIB, a claimant must show he became disabled prior to the expiration of his DLI. *See* 20 C.F.R. §§ 404.130, 404.131; Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).

[3] In this case, the ALJ identifies Plaintiff's disability onset date as July 1, 2004 (Tr. 134), although Plaintiff also alleged August 1, 2004, as his onset date  (Tr. 102), and, after his administrative hearing, Plaintiff amended the onset date to January 17, 2007 (Tr. 100).  In light of the amended onset date, the correct time frame relevant to Plaintiff's claim for DIB actually is January 17, 2007 (amended alleged onset date) through March 31, 2007 (DLI).  For purposes of this appeal, however, the court accepts the onset date of July 1, 2004, applied by the ALJ.

5)      Plaintiff has the residual functional capacity ("RFC") to perform sedentary work, with certain restrictions.[4]

6)      Plaintiff is unable to perform any of his past relevant work.

7)      Plaintiff was born on November 7, 1960. On his alleged disability onset date of July 1, 2004, Plaintiff was forty-three (43) years of age, which is defined as a younger individual.

8)      Plaintiff has at least a high school education and is able to communicate in English.

9)      Transferability of jobs skills is not material to the determination of disability because the medical-vocational rules, used as a framework for decisionmaking, support a finding that Plaintiff is not disabled, regardless of transferable job skills.

10)      In light of Plaintiff's age, education, work experience, and RFC, jobs exist in significant numbers in the national economy that Plaintiff can perform.

11)      Plaintiff was not under a disability, as defined in the Act, from July 1, 2004, his alleged onset date, through March 31, 2007, his DLI.

## III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("this Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214

---

[4] Due to back and foot pain, during the relevant period Plaintiff required the ability to alternate between sitting and standing positions approximately every thirty (30) minutes. He needed to avoid climbing ropes, scaffolds, or ladders, and avoid working at heights or with hazardous machinery, as well as working in extreme temperatures and/or humidity. He could not have engaged in prolonged stair climbing, balancing, or stooping. Due to the symptoms of his left-sided carpal tunnel syndrome, Plaintiff was limited to occasional push/pull activities with his left upper extremity. Pain moderately limited Plaintiff's ability to concentrate and attend, such that he was limited to an unskilled level of non-production pace work (Tr. 27).

(11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); <u>Falge</u>, 150 F.3d at 1322; <u>Lewis</u>, 125 F.3d at 1439; <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); <u>Lewis</u>, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.    If the claimant is performing substantial gainful activity, he is not disabled.

2.    If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.    If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.    If the claimant's impairments do not prevent him from doing his past relevant work,

he is not disabled.

> 5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

## IV.    PLAINTIFF'S EMPLOYMENT, PERSONAL, AND MEDICAL HISTORY[5]

### A.    Employment and Personal History

After completing high school Plaintiff entered the Army, where he served as a medical supply specialist (Tr. 691). He was discharged from the military in June 1987 (Tr. 144). Plaintiff's employment history also includes work as a security guard, courier, cleaner, production laborer, and material handler (Tr. 27, 164, 691). From June 2004 through December 16, 2006, Plaintiff was incarcerated in Delaware for violating a term of probation imposed in connection with a drug possession conviction (see Tr. 46–48).

The Veterans Administration ("VA") determined that from August 1, 2002, to September 15, 2005, Plaintiff was eligible to receive disability benefits based on his service-connected condition of flat feet that was considered to be 30% disabling; as of September 15, 2005, the condition was deemed to be 50% disabling (Tr. 114, 130). Following foot surgery, Plaintiff was awarded a temporary 100% disability rating for his pes planus condition from April 27, 2007, through July 23, 2007 (see Tr. 118–22). Effective May 3, 2007, the VA determined that Plaintiff was also entitled to disability benefits for bilateral knee impairments that were 20% disabling (id.; Tr. 107– 12). On July 3, 2008, Plaintiff was found also to be entitled to VA disability benefits based

---

[5] The information in this section is taken from the opinion of ALJ as well as from references to the record made both by Plaintiff and the Commissioner in their memoranda.

on bilateral hip disease that was 20% disabling, effective January 11, 2008 (*see* Tr. 144–49); with this determination, Plaintiff's permanent service-related disability rating totaled 90%. In the same July 2008 decision, however, Plaintiff was also found to be totally unemployable, effective July 24, 2007, and thus entitled to full benefits on that basis (Tr. 147).[6]

B.      Relevant Medical History

Medical records from the VA reflect that in November 2003 Plaintiff was assessed with carpal tunnel syndrome; shoulder, neck, thoracic, and lumbar pain; depression; and tobacco dependence (*see* Tr. 587–88).[7] Plaintiff was prescribed a wrist brace, pain medication, and an antidepressant. The record also notes that Plaintiff had a history of substance abuse, for which he was currently in inpatient treatment (Tr. 588).

In June 2004 podiatrist Jeffrey C. Barton, D.P.M., examined Plaintiff's feet. Dr. Barton noted the conditions of flat feet, bunions, hammer toe deformities in both feet, and a skin lesion on the right foot (Tr. 511). Plaintiff opted for corrective surgery on his feet, which was scheduled for July 16, 2004 (*id.*), but he was incarcerated before the surgery could be performed.

Plaintiff's prison medical records, which cover the period from July 2004 through November 2006 (Tr. 225–385), reflect that Plaintiff frequently complained of back pain (*see, e.g.,* Tr. 256–58, 268, 303, 309, 315, 317, 331), and foot pain (*see, e.g.,* Tr. 264, 272 , 273, 274, 301, 303, 312, 315, 317, 329, 331, 331, 334–41). Among Plaintiff's other documented conditions were hypertension, hyperlipidemia, GERD, osteoarthritis, chronic constipation, and pancreatitis (*see, e.g.,* Tr. 223, 231–41, 300). Plaintiff was provided medications and other treatments for these conditions as well as, at times, certain special accommodations for them, including use of a lower bunk, an extra mattress, a special chair, shower shoes instead of regular shoes when indoors, and orthotic devices; he also was not required to stand more than thirty minutes at a time (*see, e.g.*, Tr. 126–29). While he was incarcerated Plaintiff also was provided with mental health care. Psychological evaluations performed in November 2004 and January 2005 were unremarkable (*see* Tr. 280–85). In January

---

[6] Plaintiff was assigned a temporary 100% disability rating while he convalesced from foot surgery performed in April 2007. July 24, 2007, was the first day after the expiration of the temporary 100% rating, and thus it was the first day Plaintiff was eligible to receive a permanent rating of "unemployable" (Tr. 147).

[7] Plaintiff has received treatment at various VA facilities since at least 2003. For ease of reference, the court simply refers to records from the VA rather than citing any specific facility.

2006, Plaintiff was diagnosed with situational anxiety and stress; he was found to be "stable," however, and no treatment was recommended at that time (Tr. 278–80). During his incarceration it appears that Plaintiff received no treatment, including medication, for any mental health condition.

In January 2007, shortly after Plaintiff was released from prison and prior to his DLI of March 31, 2007, a VA podiatrist examined Plaintiff's feet (Tr. 389–97). According to the podiatrist, Plaintiff's conditions of flat feet, bilateral degenerative joint disease ("DJD"), bunions and hammer toes prevented him from performing chores, shopping, exercising, or playing sports (Tr. 396, 475). Plaintiff also underwent a general physical examination in January 2007 (Tr. 405–07), at which it was noted that his hypertension was currently poorly controlled; he had left shoulder, cervical, thoracic and lumbar spine pain; carpal tunnel disease; and a history of substance abuse and tobacco dependence (Tr. 406). Plaintiff reported that he snored at night and fell asleep during the day. Additionally, he felt depressed. Plaintiff was screened for allergies, alcohol/drug use, amount of exercise, depression, and post-traumatic stress disorder, among other tests. Both the test for depression and for post-traumatic stress disorder—which were comprised of several questions asked by a licensed practical nurse—were negative (Tr. 437).

An examination of Plaintiff's spine performed at the VA in February 2007 revealed diffuse tenderness of the musculature in the thoracic and lumbar areas (Tr. 387). Plaintiff reported that he did not use a cane or back brace and that his walking tolerance was one block or ten (10) minutes (Tr. 386). He was using the pain medication Feldene "with some relief" and no side effects (*id.*). Radiographs showed mild degenerative changes in Plaintiff's thoracic and lumbar spine, with only slight changes in the lumbar spine since a previous x-ray in November 2003 (Tr. 388, 474). Plaintiff was examined again at the VA in February 2007, when it was noted that his hypertension was controlled and that he was taking Feldene for his shoulder, cervical, thoracic and lumbar DJD, as well as his carpal tunnel condition (Tr. 402). He was also prescribed an antidepressant medication (Tr. 398).

In March 2007 Plaintiff was diagnosed with sleep apnea, for which he was advised to use a continuous positive airway pressure ("CPAP") machine (Tr. 408; *see also* Tr. 522–28). Also in March 2007 Plaintiff was seen by a private physician, Jack Milligan, M.D. (Tr. 542), who noted that Plaintiff had a history of hypertension and DJD and had recently been prescribed an antidepressant

(*id.*, Tr. 541). Based on Plaintiff's complaints of severe back pain, Dr. Milligan referred Plaintiff to Ronald Lieberman, D.O., for further evaluation (Tr. 541).

In April 2007, Dr. Barton performed surgery on Plaintiff's right foot to remove a bunion and fuse joints in two toes (Tr. 480–84). Also in April 2007, Dr. Lieberman examined Plaintiff (Tr. 556–58), noting in a report dated April 13, 2007, that he had found "subjective complaints of low back pain with no objective clinical corroboration" (Tr. 557). Dr. Lieberman ordered a magnetic resonance imaging ("MRI") scan of Plaintiff's spine (Tr. 558), which revealed the following: mild degenerative discogenic disease at the L5-S1 level, with a small disc bulge and broad-based disc herniation, and osteoarthritic changes of the facet joints with hypertrophy of the ligamenta flava causing mild spinal canal stenosis and narrowing of the lateral recesses without displacement of the adjacent S1 nerve roots. Similar osteoarthritic changes were noted at the L4-L5 level (Tr. 478–79).

Glen D. Rowe, D.O., examined Plaintiff's left knee in May 2007 (Tr. 529–33). He noted that an MRI revealed a small focal chondral defect, partial thickness in character, along the posterior lateral femoral condyle (Tr. 530). There was also an area of partial thickness chondral loss and subchondral marrow edema beneath the posterior lateral femoral condyle (*id.*). Additionally, there was a small linear fissure near the patellar apex (*id.*). Dr. Rowe advised Plaintiff that limping caused by his recent foot surgery could aggravate the degenerative problems in his knee, hip, and lower back. Dr. Rowe discussed with Plaintiff the possibility of performing arthroscopic surgery on the left knee to correct cartilage damage, but he decided that a final decision on the procedure could wait until Plaintiff's other medical problems had been resolved (Tr. 529).

Plaintiff was seen at F. H. Everett & Associates for a psychological evaluation on May 18, 2007 (Tr. 548–52). Plaintiff's diagnosis was bipolar disorder, mixed episodes, with a current Global Assessment of Functioning Score ("GAF")[8] of 50 (Tr. 552). Mood stabilization medication was advised (*id.*). It was also noted that after a recent breakup of a relationship Plaintiff was staying in

---

[8] GAF is the overall level at which an individual functions and addresses social, occupational, academic, and other areas of personal performance. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994). GAF may be expressed as a numerical score. *Id.* at 32.

A GAF score between 31 and 40 reflects some impairment in reality test or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. *Id.* A score between 41 and 50 reflects serious symptoms or any serious impairment in social, occupational, or school functioning. *Id.* A score between 51 and 60 reflects moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*

a homeless shelter (Tr. 549). Plaintiff was seen again at F. H. Everett & Associates in June 2007, when his diagnosis again was bipolar disorder (rule out substance-induced) and his GAF score was estimated to be 40–45 (Tr. 544).

Dr. Lieberman performed an electrodiagnostic evaluation of Plaintiff in June 2007 for paresthesias of both lower extremities (Tr. 553). The results of the electromyographic examination and nerve conduction tests suggested sensory axon loss peripheral neuropathy with a motor demyelinating component. These results, based on Plaintiff's history of alcoholism, indicated a possible remote alcoholic polyneuropathy (*id.*).

In August 2007 Plaintiff was seen by a VA psychiatrist (Tr. 583–84). Plaintiff reported that he had suffered from depression for years and had recently been diagnosed with bipolar disorder (Tr. 583). The psychiatrist's impression was possible bipolar disorder, but he noted that the condition's "very late onset" and Plaintiff's prior drug and alcohol use clouded the diagnosis (Tr. 584). Plaintiff's GAF score was estimated to be 55. He was advised to continue taking his prescribed antidepressant and was started on another one. Plaintiff returned to the VA one week later, when his medications were adjusted (Tr. 580). His diagnosis was mixed bipolar disorder, with a GAF score of 55. Plaintiff was seen at the VA again two weeks later, when he reported that he still suffered from mood swings and experienced hallucinations; his mental disorder medications were again adjusted (Tr. 577). His diagnosis remained mood disorder and his GAF score was unchanged at 55 (*id.*).

In October 2007 Plaintiff was seen at a VA facility for complaints of foot pain (Tr. 656). He was counseled on the importance of wearing shoes with proper support and following through with supportive therapies, such as stretching and icing (Tr. 656–57). Plaintiff underwent imaging of his knees in October 2007, which revealed a "normal bilateral knee series" with no bony, joint, or soft tissue abnormalities (Tr. 678–79). During a VA visit in December 2007 Plaintiff was informed that radiographs showed degenerative disease of the metatarsal joints (Tr. 637–38). He was again advised about the importance of using arch supports, and surgical corrective options were discussed (Tr. 638). Also in December 2007, Plaintiff presented for a mental health follow-up visit at a VA facility. His diagnosis was chronic bipolar disorder, with a GAF of 55; his medications were adjusted (Tr. 643). Plaintiff returned two weeks later, reporting continued mood swings (Tr. 637).

Plaintiff was described as "doing a little better," and his prescriptions again were renewed or altered (Tr. 637). In January 2008 Plaintiff received instruction at a VA facility on the use of a cane (Tr. 636). In February 2008, during a routine examination, Plaintiff reported continuing pain in his feet, back, knees, and hips; he estimated the pain to be 6 on a scale of 10 and stated it was alleviated by his pain medication (Tr. 633–34). A screening test for depression was also performed, which was negative (Tr. 634). In March 2008, after Plaintiff reported feeling anxious and depressed, his medications were adjusted (Tr. 625–27).

In April 2008 psychologist Joseph G. Law, Ph.D., conducted an "Evaluation/Assessment for Feasibility & Independent Living" of Plaintiff at the request of the VA Department of Vocational Rehabilitation and Employment (Tr. 690–97). As part of his evaluation, Dr. Law administered several tests to assess Plaintiff's emotional and cognitive functioning. In his report dated April 30, 2008, Dr. Law recounted Plaintiff's personal, educational, vocational, and medical history; he also outlined the basis for Plaintiff's VA service-connected combined disability rating of 70% and described his nonservice-connected conditions. Additionally, Dr. Law noted Plaintiff's recent treatments and medications. Dr. Law also recorded Plaintiff's responses to questions concerning his perception of the functional limitations caused by his disability, and Dr. Law reported the results of the emotional and cognitive functioning tests he had administered to Plaintiff. Dr. Law's impression was that Plaintiff suffered from bipolar disorder, with a current GAF score of 45–50 (Tr. 693). Dr. Law concluded that Plaintiff was not able to meet the mental demands of unskilled sedentary work and was not a candidate for vocational rehabilitation, training, or job placement (*id.*). Based on his review of Plaintiff's aptitudes, achievement, interests, personality dynamics, and limitations due to service-connected disabilities, Dr. Law concluded that Plaintiff was "totally disabled vocationally and unemployable" (Tr. 694, 696).

In May 2008 Plaintiff underwent a nerve conduction study of his lower legs (Tr. 700). The results of the study were normal, which suggested that Plaintiff's flat feet were the source of his leg problems (Tr. 700). The report of a bone scan performed in June 2008 reflected that Plaintiff had degenerative changes in his hips, knees, feet, shoulders, wrists, and hands (Tr. 714). Also in June 2008, a whole body bone scan revealed some degenerative changes in the hips, knees, feet, shoulders, wrists, and hands, but the overall impression was "slight degenerative changes without

ominous findings" (Tr. 714).

## V.     OPINIONS OF NON-EXAMINING PHYSICIANS AND HEARING TESTIMONY

### A.     Opinions of Non-examining State Agency Physicians

The ALJ considered the opinions of two non-examining State agency medical consultants. The first, Karen Sarpolis, M.D., opined that Plaintiff retained the RFC to perform a generally full range of light work activity during the time period in question (Tr. 534–39). Finding that the evidence supported a finding that Plaintiff was more limited than Dr. Sarpolis indicated, the ALJ gave her opinion little weight.

Michael Borek, M.D., the second non-examining State agency medical consultant whose opinion the ALJ considered, opined that Plaintiff retained the RFC to perform a limited range of sedentary work, with certain restrictions for hazards due to Plaintiff's medications (Tr. 26, 559–66). The ALJ gave Dr. Borek's opinion significant weight, finding it to be an accurate and reasonable assessment of Plaintiff's work-related abilities and limitations during the relevant time period.

### B.     Administrative Hearing Testimony

At the administrative hearing Plaintiff testified that he suffered from a "crippled" left foot, severe knee pain, pain in both hips, pancreatitis, GERD, sleep apnea, hypertension, high cholesterol, bipolar disorder, carpal tunnel syndrome, and neuropathy in both legs (Tr. 34–35, 49). He reported severe, constant pain in his feet and severe, intermittent pain in his knees and lower back (Tr. 38–39). According to Plaintiff, he could sit for "quite a while" before getting pain in his back and needed to stand (Tr. 42). If he stood for ten (10) minutes he got "bad" pain in his feet, knee, hip, and back (*id.*). The gripping ability is his left hand varied: "[i]t depends, the tingling comes and goes" (*id.*). Plaintiff testified that he could lift and carry no more than fifteen pounds and climb one or two flights of stairs at a time (Tr. 43).

The ALJ posed the following hypothetical to the vocational expert ("VE") who testified at the hearing. The hypothetical claimant was a forty-three year old man with Plaintiff's education, experience, and medical disorders. He could lift ten pounds occasionally and less weight frequently; had mild limitations on his ability to push, pull, and grip with his left arm; had the ability to stand for thirty (30) minutes and sit for thirty (30) minutes consistently on an alternating basis; and he could climb, balance, or stoop no more than twice an hour (Tr. 54–56). This individual required

simple, routine, unskilled, low-stress jobs, suffered from occasional mood swings, and was moderately limited in his ability to perform activities of daily living, interact socially, and perform tasks requiring concentration persistence, and pace (*Id.*). The individual must avoid heights, machinery, temperature and humidity extremes, stairs, ropes, scaffolds, and ladders. In response, the VE testified that such a person could not perform Plaintiff's past relevant work. He could, however, perform other jobs that existed in substantial numbers in the national economy, such as food and beverage order clerk, addresser, and stuffer (Tr. 56–57).

## VI.    DISCUSSION

Plaintiff raises the following six issues in the instant appeal: (1) the ALJ was required, but failed, to give great weight to the VA's July 3, 2008, determination that Plaintiff was completely disabled; (2) at step two of the sequential evaluation the ALJ improperly concluded that Plaintiff's mental health problems and knee conditions were not severe impairments; (3) the ALJ improperly rejected Plaintiff's testimony regarding his subjective complaints; (4) the ALJ's RFC assessment is not supported by substantial evidence; (5) the ALJ failed to develop the record by obtaining medical and psychological consultative examinations; and (6) the ALJ did not require the VE to reconcile a conflict between his testimony and information contained in the Dictionary of Occupational Titles ("DOT").[9] The court concludes that the first of these issues warrants remand of this matter for further proceedings. Given this conclusion, the court addresses Plaintiff's five other claims of error only briefly.

1.    VA's July 3, 2008, Rating Decision

Social Security Regulations provide that a disability decision made by another governmental agency is based on that agency's own rules and therefore is not binding on the Commissioner. 20 C.F.R. § 404.1504; *see also* Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001) (stating that a "rating of total and permanent disability is not legally binding on the Commissioner because the criteria applied by the two agencies is different . . . ."). Nevertheless, a disability decision by another governmental agency, such as the VA, constitutes evidence that should be considered and is entitled to be given great weight. Kemp v. Astrue, 308 Fed. App'x. 423, 426 (11th Cir. 2009);

---

[9]  The issues are not discussed in the order in which Plaintiff presents them but rather in the order the court elects to address them.

Rodriguez v. Schweiker, 640 F.2d 682, 686 (5th Cir. 1981).[10]

Nowhere in his decision does the ALJ explicitly reference the VA's July 3, 2008, rating decision.[11]  Thus the ALJ does not state that he in fact considered the decision, much less specify reasons for not according it great weight.  This failure alone, on its face, should be sufficient reason to remand the case to the Commissioner for further consideration.

The ALJ briefly addresses Dr. Law's April 30, 2008, report, which the VA's July 3, 2008, determination references (Tr. 27).[12]  The ALJ states that he considered Dr. Law's opinion but accorded it little weight because it was "formulated using different regulatory and evidentiary standards than those required" under the Act and therefore was "not a probative assessment of the claimant's residual functional capacity pursuant to the [relevant] regulatory and evidentiary standards . . . ." (id.)

As an initial matter, even accepting that Dr. Law's report supplies at least part of the rationale for the VA's July 3, 2008, rating decision, the court notes that the contents of the two documents are not co-extensive.  The rating decision addresses prior findings made by the VA based on physical disability which Dr. Law discusses in his report but had no part in making.  Also, the VA decision addresses findings the VA made after Dr. Law issued his report, specifically, Plaintiff's bilateral hip condition which the VA found disabling (although not until January 11, 2008).  Moreover, the purposes of the two documents are decidedly different:  the stated purpose of Dr. Law's report is to evaluate Plaintiff and offer an opinion so that "the VA counselor could assess his feasibility for employment, education or need for independent living services" (Tr. 690).  The

---

[10]   Decisions of the United States Court of Appeals for the Fifth Circuit decided on or before September 30, 1981 are binding precedent in the Eleventh Circuit.  Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

[11]   As previously noted, based on this rating decision, Plaintiff's service-connected conditions were a total of 90% disabling [30% disabling as of August 1, 2002; 50% disabling as of September 15, 2005; 70% disabling as of May 3, 2007; and 90% disabling as of January 11, 2008] and that he was completely unemployable as of July 24, 2007 [or within approximately four months after Plaintiff's DLI of March 31, 2007].

[12]   The July 3, 2008, decision does not identify Dr. Law by name, except when citing his report in the list of evidence reviewed (Tr. 145).  Nor does the decision discuss (what presumably is) Dr. Law's report to any extent, other than by a two-sentence mention of "[i]nformation received from the VA Department of Vocational Rehabilitation and Employment" in the body of the text (Tr. 147).  Indeed, while the determination may be, and likely is, referencing Dr. Law's report, it seems that it may also be referencing another item of evidence, a letter received from the Department of Vocational Rehabilitation and Employment.

obvious purpose of the VA's determination, on the other hand, is to render a decision on disability and/or employability, based on its prior assessments and the relevant evidence, including reports such as Dr. Law's. Accordingly, it does not appear to this court that in the ALJ's decision Dr. Law's evaluation should be permitted to "stand in" for the VA's rating decision.

Nevertheless, assuming, *arguendo*, that Dr. Law's April 30, 2008, report is an acceptable substitute for the VA's July 3, 2008, rating decision, in which it ultimately found Plaintiff was unemployable as of July 24, 2007, the court is not convinced that the ALJ properly rejected it. As the ALJ indicated, the VA and the SSA apply different regulatory and evidentiary standards in assessing disability. That fact alone, however, cannot be a sufficient reason for rejecting a VA rating decision; if it were, no such determinations would ever receive the consideration and weight which they are due. *See* Kemp, 308 Fed. App'x. at 426; Rodriguez, 640 F.2d at 686.

The Commissioner argues that in his decision the ALJ "noted that the VA determination was based on Dr. Law's April 2008 opinion, which was, in turn, based 'almost exclusively' on Plaintiff's statements, which [the ALJ] had found not to be entirely credible"[13] (Doc. 19 at 21). As discussed, however, the ALJ did not note that the VA determination was based on Dr. Law's report; the ALJ made no mention of the VA's July 3, 2008, decision at all. In any event, in the section of his decision rejecting Dr. Law's report, the ALJ makes no explicit reference to Plaintiff's lack of credibility. He simply mentions the subjectivity of Plaintiff's statements (Tr. 27). Even accepting that the ALJ might have intended to apply his adverse credibility finding to Plaintiff's self-reported pain levels and self-assessed limitations, however, the court concludes that this reason alone is not adequate to reject the entire evaluation. While Plaintiff's subjective responses that were elicited during the interview indeed are part of Dr. Law's report, the court does not agree that the opinion of unemployability is "[b]ased almost exclusively" on those responses. Rather, Dr. Law also cites earlier findings and determinations made by VA decisionmakers, as well as his own professional opinion based on observations made during his clinical interview of Plaintiff and the results of the

---

[13] The Commissioner does not cite the ALJ's ruling, but apparently he refers to this statement in the decision: "After considering both the subjective and objective evidence of record, and for the reasons set forth herein, the undersigned finds that although the claimant's stated symptoms are attributable to his medically determinable and severe impairments as found above, the intensity, persistence, and limiting effects of those symptoms on his work-related abilities are not as restrictive as the claimant asserts." (Tr. 25).

objective tests he administered.

The Commissioner additionally contends that the ALJ was not required to give great weight to a determination that was "made long after the expiration of Plaintiff's insured status." (Doc. 19 at 21). While the VA's decision was entered July 3, 2008, or approximately fifteen months after Plaintiff's DLI, the effective date of the decision for purposes of the unemployability finding was July 24, 2007, or only about four months after Plaintiff's DLI. Further, Plaintiff's flat feet condition had been found to be 30% disabling as of August 1, 2002, and 50% disabling as of September 15, 2005, both of which dates fall far prior to Plaintiff's DLI of March 31, 2007. Moreover, Plaintiff's knee conditions were determined to be 20% disabling as of May 3, 2007, or only slightly more than one month after his DLI. Given these dates, which are prior to or in close proximity to the DLI, it seems that the VA's disability findings could be relevant to the Commissioner's evaluation of whether Plaintiff was disabled for purposes of Social Security disability benefits prior to his DLI. Finally, the court agrees with the Commissioner's contention that the ALJ was not required to accept a decision which "conflicts with the medical evidence from the insured time period" (*id.*). If the ALJ believed the decision conflicted with the relevant medical evidence, however, he could have explained—but did not—the basis for this conclusion in his decision.

For the reasons given above, this court recommends that the instant case be remanded to the Commissioner so that the ALJ can properly consider the VA's July 3, 2008, rating decision. If the ALJ determines that the rating decision should not be accorded great weight, he should explain why he does not find the decision persuasive. Chambliss, 269 F.3d at 522 (noting that "ALJs need not give 'great weight' to a VA disability determination if they adequately explain the valid reasons for not doing so.").

2.      The ALJ's Step Two Determination

Plaintiff argues that the ALJ erred by failing to find that his depression and left knee condition were severe impairments. The court disagrees.

At step two of the sequential evaluation the ALJ must determine whether the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). An impairment is "severe" if it "significantly limits [a] claimant's physical or mental ability to do basic work activities." Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997) (citation omitted); 20 C.F.R. § 404.1521(a). An impairment is not

severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience. McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986); Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984) (per curiam). It is a threshold inquiry where only the most trivial impairments are rejected. Id. The claimant bears the burden of proving that he has a severe impairment or combination of impairments. Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999). At step two the burden is mild, however, such that a claimant need only show that his "impairment is not so slight and its effect is not so minimal" as to be trivial. McDaniel, 800 F.2d at 1031.

Plaintiff's prison medical records, which cover the period July 2004 through November 2006, do not show that he was diagnosed with or received treatment for a mental impairment while incarcerated (see Tr. 277–85). Furthermore, the facts that the VA prescribed an antidepressant for Plaintiff in February 2007 (Tr. 398), or that the following month Dr. Milligan made a note of that prescription (Tr. 542), do not show that Plaintiff suffered from a severe mental impairment prior to his DLI. The VA's February 20, 2007, record simply notes Plaintiff's report of depression without addressing the severity of any symptoms (Tr. 400); moreover, no mental health impairments appeared on the VA's list of Plaintiff's active problems (id.). Dr. Milligan likewise does not discuss the severity of any symptoms but rather merely takes note that Plaintiff was "now on Celexa [an antidepressant] – new Rx since incarceration" (Tr. 542). Although substantial weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise, see Lewis, 125 F.3d at 1440, contrary to Plaintiff's contention, the records from Dr. Milligan—comprised only of notes from two visits in March 2007 and one visit in June 2007 (Tr. 540–42)—do not reflect that Dr. Milligan actually diagnosed Plaintiff with depression. Also, although Plaintiff suggests otherwise, the ALJ did not reject any "valid retrospective opinion regarding a remote onset of disability" (Doc. 14 at 9), because neither Dr. Milligan nor the VA physician offered such an opinion. In short, the court concludes that Plaintiff has failed to show that, prior to his DLI of March 31, 2007, he suffered from a mental impairment that significantly limited his ability to perform basic work activities such that the ALJ should have found the impairment severe.

Plaintiff also contends that, in light of the 20% disability rating assigned in May 2007 due

to his knee conditions, no "reasonable person could validly conclude that [Plaintiff's] knee problems would have less than a minimal effect on his ability to do work activities" (Doc. 14 at 7). The record medical evidence, however, does not support a finding that Plaintiff's left knee condition was severe prior to his DLI. The VA determination does not cite any medical evidence in support of its assessment (Tr. 107–12), and Plaintiff points to no evidence in his prison medical records regarding complaints of or treatment for knee pain. Furthermore, although the MRI taken in May 2007 revealed cartilage damage, Dr. Rowe, the osteopathic physician, only considered "the *possibility* of doing an arthroscopic procedure" and noted that Plaintiff could return later, after his other problems had been resolved, "to discuss *possible* surgical intervention on his knee" (Tr. 529) (emphases added). Dr. Rowe did not did not identify the left knee condition as severe, only suggested the possibility that surgery would be indicated, and Plaintiff apparently never returned for further assessment. Also, imaging of Plaintiff's knees in October 2007 was normal, with no bony, joint, or soft tissue abnormalities (Tr. 678–79), and a whole body scan performed in June 2008—more than fourteen months after Plaintiff's DLI of March 31, 2007—showed only "slight" degenerative changes in the knees (Tr. 714). The court therefore concludes that the medical evidence does not support a finding that Plaintiff's left knee condition was severe within the meaning of step two of the sequential analysis prior to the expiration of his insured status.

3.      The ALJ's Credibility Finding

Plaintiff asserts that the ALJ erred in discrediting his subjective testimony that, due to foot and back pain, he is able to stand or walk only about ten (10) minutes at a time and must use a cane. According to Plaintiff, reversal is required because the ALJ failed to articulate explicit and adequate reasons for rejecting his subjective testimony and failed to question him regarding the factors set forth in Social Security Ruling ("SSR") 96-7p, such as with respect to his daily activities; the location, duration, frequency, and intensity of his pain; and circumstances that precipitate and aggravate his pain.

The court concludes it is unnecessary to recite in detail the law pertaining to the treatment of pain and other subjective complaints in Social Security claims or analyze at length the ALJ's rationale in this case for discounting Plaintiff's pain testimony. Simply put, if an ALJ refuses to credit subjective pain testimony where such testimony is critical, the ALJ must articulate specific

reasons, which are supported by record evidence, for questioning the claimant's credibility. *See* Foote, 67 F.3d at1562 (a clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court); *see also* Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992); MacGregor, 786 F.2d at 1054. Here, the ALJ's reasons and the record support giving less than full credit to Plaintiff's subjective testimony. The ALJ noted that despite Plaintiff's claims of severe pain prior to his DLI of March 31, 2008, in April 2007 Dr. Lieberman reported few significant objective findings concerning Plaintiff's lumbar and neuropathic conditions; Plaintiff's pain medication, Feldene, was never adjusted to a more potent medication; and during the time he was incarcerated Plaintiff was observed jumping easily to an upper-level bunk (Tr. 25–26). Furthermore, the ALJ's credibility determination is supported by Plaintiff's own statement, reported in a February 1, 2007, VA visit (Tr. 386), that he did not use a cane or back brace and that his walking tolerance was one block or ten (10) minutes. This statement—made only about two months prior to Plaintiff's DLI of March 31, 2007—is in direct contradiction to Plaintiff's assertion that prior to the expiration of his insured status he was able to stand or walk only about ten (10) minutes at a time <u>and</u> needed to use a cane due to severe pain.

The court concludes that the ALJ adequately articulated reasons for finding Plaintiff's subjective testimony less than fully credible and that substantial record evidence supports the ALJ's credibility determination. *See* Foote, 67 F.3d at1562; Marbury, 957 F.2d at 839; MacGregor, 786 F.2d at 1054.

4.     The ALJ'S Residual Functional Capacity Determination

Plaintiff argues that the ALJ erred in evaluating his RFC. As discussed, the court recommends that this case be remanded to the Commissioner to consider the VA's July 3, 2008, disability determination. The ALJ's consideration of the VA's decision could affect his assessment of Plaintiff's RFC. Although the court therefore need not address Plaintiff's arguments on this issue, it briefly notes the following.

Residual functional capacity is an assessment based on all relevant evidence of a claimant's remaining ability to do work despite his impairments. 20 C.F.R. § 404.1545(a); Lewis, 125 F.3d at 1440. The focus of the RFC assessment is on the physician's evaluation of the claimant's condition and the condition's medical consequences. *Id.* The ALJ is required to consider evidence from

non-examining sources, *see* 20 C.F.R. § 404.1527(f)(1), and he may treat the reports and assessments of State agency physicians as expert opinions. 20 C.F.R. § 404.1527(f)(2)(i). The opinion of a non-examining physician is entitled to little weight, however, if it is contrary to the opinion of a claimant's treating physician. Broughton v. Heckler, 776 F.2d 960, 962 (11th Cir. 1985). Here, it does not appear that the ALJ gave undue weight to the opinion Dr. Borek, the non-examining State agency physician whose opinion he accepted. The ALJ considered Plaintiff's VA and prison medical records, as well as the records from Plaintiff's private physicians and Plaintiff's own hearing testimony in reaching his RFC assessment. Moreover, Dr. Borek's opinion is not inconsistent with the opinion of any treating physician, as Plaintiff points to no opinion offered by a treating physician regarding his physical abilities or whether he would be restricted from performing work.

Additionally, contrary to Plaintiff's assertion, the ALJ was not required to consider Plaintiff's need to use a cane for ambulation when assessing Plaintiff's RFC. There is a paucity of evidence in the medical record for the relevant period concerning this limitation and, as discussed previously, the ALJ was entitled to discount Plaintiff's subjective testimony on this issue. Plaintiff also contends that his bipolar condition must be considered in connection with the assessment of his RFC. Although impairments that are found non-severe should be considered in making the RFC determination, 20 C.F.R. § 404.1523, the ALJ did so in this case. In the hypothetical question the ALJ posed to the VE he included certain mental limitations (Tr. 55), then found that Plaintiff could perform the jobs identified by the VE which included those restrictions (Tr. 28). Also, in making his RFC assessment, the ALJ adequately considered Plaintiff's limitations caused by his carpal tunnel syndrome (Tr. 27). Plaintiff points to nothing in the record suggesting that during the relevant period this condition imposed a greater restriction than found by the ALJ. Finally, Plaintiff complains that the ALJ's finding that he would need to alternate between sitting and standing every thirty minutes would result in his standing a total of a least four hours per workday. Plaintiff submits that "[t]here is no medical evidence from any source to indicate that [he] could be on his feet for a total of 4 [hours] during the workday. Even Dr. Borek . . . stated that [Plaintiff] would be limited to being on his feet for 2 hours per day" (Doc. 14 at 10). This contention it meritless. The ALJ determined that Plaintiff could perform sedentary work, which involves sitting for six hours in

an eight-hour workday and standing or walking two hours in an eight-hour work day. *See* 20 C.F.R. § 404.1567(a); Kelley v. Apfel, 185 F.3d 1211, 1213 n.2 (11th Cir. 1999). Thus Plaintiff would not be required to stand up to four hours per day to perform the work identified by the ALJ as being within his RFC, a determination based, in part, on Dr. Borek's opinion.[14]

5.    Development of the Record

Plaintiff argues that the ALJ should have developed the record by obtaining orthopedic and psychological consultative examinations.    According to Plaintiff, the record reflects he had significant orthopedic problems and suffered from a mental impairment prior to his DLI, yet no examining physician ever assessed his ability to do either physical or mental work-related activities.

It is well established in the Eleventh Circuit that an ALJ has an affirmative duty to develop a full and fair record. Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003); Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995).   The duty to develop the record exists even if, as in this case, the plaintiff is represented by an attorney. Brown, 44 F.3d at 934 (citation omitted).   In light of the ALJ's obligation to develop the record, he must order a consultative examination when "such an evaluation is necessary for him to make an informed decision." Holladay v. Bowen, 848 F.2d 1206, 1209 (11th Cir. 1988) (quoting Reeves v. Heckler, 734 F.2d 519, 522 n.1 (11th Cir. 1984)). Nonetheless, it remains the plaintiff's burden prove that he is disabled and he is responsible for producing evidence in support of his claim. *See* Ellison, 355 F.3d at 1276 (citing 20 C.F.R. § 416.912(a), (c)).   Furthermore, case law in this circuit requires the plaintiff to show some prejudice before a remand to the Commissioner for further development is ordered. *See* Graham v. Apfel, 129 F.3d 1420, 1423 (11th Cir. 1997).   In considering whether a remand is required, the court should be guided by whether there are evidentiary gaps in the record that result in unfairness or clear prejudice. *Id.*

Plaintiff contends only that the ALJ should have requested the examinations "so that he could make an informed decision regarding [Plaintiff's] true RFC" (Doc. 14 at 13).   Plaintiff does not explain why the ALJ needed consultative psychological and orthopedic reports from examining

---

[14]   The court notes that in fact Dr. Borek did not state that Plaintiff would be limited to standing for two hours per day, as Plaintiff submits; rather, Dr. Borek indicated that Plaintiff could "[s]tand and/or walk (with normal breaks) *at least* two hours in an 8 hour workday" (Tr. 560) (emphasis added) and that the objective physical evidence "would not appear to preclude stand/walk 2 h[ours] per day" (Tr. 566).

physicians in order to make an informed disability decision, nor does Plaintiff explain how he has been prejudiced by the lack of such reports.[15]  Plaintiff therefore has not asserted, or shown, an adequate basis for a remand to develop the record by obtaining additional assessments.  In any event, the court is satisfied that the ALJ was not required to seek consultative examinations in order to adequately evaluate Plaintiff's RFC at the time his insured status expired on March 31, 2007.  As outlined above, the VA, prison, and private treating sources' records available to the ALJ concerning Plaintiff's depression/bipolar condition and his foot, spine, knee, and hip conditions were sufficient for that purpose.  Moreover, any such examinations ordered by the ALJ at the time of his review but pertaining to the relevant time frame would necessarily have been highly speculative and, at least in part, likely based on the records which the ALJ had already reviewed.  *See* Wilson v. Apfel, 179 F.3d 1276, 1278 (11th Cir. 1999) (holding that additional expert medical testimony was unnecessary where the record was sufficient for a decision).  Accordingly, the ALJ did not err by failing to order orthopedic and psychological consultative evaluations by examining physicians.

6.   Conflict Between Vocational Expert's Testimony and the Dictionary of Occupational Titles

Plaintiff contends that there was a conflict between the VE's testimony that Plaintiff could perform certain jobs requiring a sit/stand option and the job descriptions in the DOT which do not contemplate a sit/stand option.  More particularly, Plaintiff contends that although the VE testified that the three jobs he identified as being ones Plaintiff could perform were "in line with the criteria contained in the Dictionary of Occupational Titles," including the requirement of a sit/stand option (Tr. 57), "[t]his is patently false, as the DOT does not identify any jobs that would allow a sit/stand option" (Doc. 14 at 14).  According to Plaintiff, pursuant to SSR 00-4p,[16] the ALJ was required to

---

[15]  Plaintiff also does not specify the nature of the "orthopedic" examination he contends was required, *e.g.*, whether the examination should focus on the feet, spine, knees, and/or hips.

[16]  Social Security Ruling 00-4p provides in part:

When a [VE] provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE [] evidence and information provided in the DOT.  In these situations, the adjudicator will:

* Ask the VE[] if the evidence he or she has provided conflicts with information provided in the DOT; and

* If the VE's [] evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable

resolve this conflict before relying on the VE's testimony by obtaining a reasonable explanation for the disparity, but the ALJ failed to do so.

During the administrative hearing in this case, the ALJ asked the VE whether "the exertion level, skill level and sit/stand in those jobs [would] be in line with the criteria that is contained in the Dictionary of Occupations Titles at this time?" (Tr. 57). The VE responded, "Yes." (*Id.*). In his decision, the ALJ noted that "[p]ursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles except for his testimony with regard to the sit/stand option permitted by the cited work — which the expert testified was based upon his education, training, and experience in the field of vocational and occupational rehabilitation." (Tr. 28).

First, the court perceives no substantial conflict between the testimony of the VE and the provisions of the DOT pertaining to the jobs identified by the VE as being within Plaintiff's ability to perform, the positions of food and beverage order clerk, addresser, and stuffer. According to the DOT, these are sedentary positions which involve "sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met." DOT App. C, ¶ IVc (listings 209.567-014, 209.587-010, and 731.685-014). The DOT thus appears to take into account that a sedentary job involves periodically alternating between sitting and standing.

Even if a conflict between the VE's testimony and the DOT exists, however, the ALJ did not err by failing to obtain an explanation from the VE for it. In <u>Jones v. Apfel</u>, 190 F.3d 1224 (11th Cir. 1999), the Eleventh Circuit held that "when the VE's testimony conflicts with the DOT, the VE's testimony 'trumps' the DOT." *Id.* at 1229–1230. The court reasoned that the VE's testimony may be accepted because "the DOT is not the sole source of admissible information concerning jobs" and that by its own wording "the SSA itself does not consider the DOT dispositive." *Id.* at 1230. Thus, under <u>Jones</u> an ALJ may rely upon the testimony of a VE without first resolving any conflict with the DOT. Although SSR 00-4p was promulgated in 2000, which was the year after

explanation for the apparent conflict.

*See* http://www.socialsecurity.gov/OP_Home/rulings/di/02/SSR2000-04-di-02.html (last visited June 28, 2010).

<u>Jones</u> was decided, in 2007 the Eleventh Circuit revisited the issue in an unpublished decision, <u>Miller v. Comm'r of Soc. Sec.</u>, 246 Fed. App'x 660 (11th Cir. 2007).  The <u>Miller</u> court reiterated that agency rulings such as SSR 00-4p do not bind appellate courts.  It stated that "[e]ven assuming that an inconsistency existed between the testimony of the vocational expert and the DOT, the ALJ did not err when, without first resolving the alleged conflict, he relied on the testimony of the vocational expert.  Our precedent establishes that the testimony of a vocational expert 'trumps' an inconsistent provision of the DOT in this Circuit." *Id.* at 661–662 (citing <u>Jones</u>).  Thus, even though SSR 00-04p was promulgated after <u>Jones</u> was decided, it does not mean the rule in <u>Jones</u> no longer applies.  Moreover, SSR 00-4p does not expressly mandate that an ALJ independently investigate whether there is a conflict between the VE's testimony and the DOT.  Rather, SSR 00-4p merely requires that the ALJ ask the VE if there is a conflict; if the VE identifies a conflict only then must the ALJ address the conflict in his decision and resolve it.  *See*, *e.g.*, <u>Martin v. Comm'r of Soc. Sec.</u>, 170 Fed. App'x 369 (6th Cir. 2006); <u>Haas v. Barnhart</u>, 91 Fed. App'x 942, 947-48 (5th Cir. 2004).

Here, the ALJ asked the VE whether the jobs he identified were consistent with the requirements of the DOT, and the VE stated they were (Tr. 57).  In this case, therefore, apart from the fact that in the Eleventh Circuit the VE's testimony "trumps" the DOT, the ALJ did not err because he fulfilled his initial obligation under SSR 00-04p by inquiring whether a conflict existed.[17] Being advised by the VE that there was no conflict, the ALJ was not required to investigate further.

VII.    CONCLUSION

For the foregoing reasons, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **REVERSED**, that pursuant to sentence four of 42 U.S.C. § 405(g) the

---

[17]  As noted above, the ALJ indicated the VE testified that the information he provided was consistent with the DOC, except with regard to the sit/stand option; the ALJ noted that the VE testified that particular information was based upon his education, training, and experience in the field of vocational and occupational rehabilitation (Tr. 28).  As Plaintiff apparently contends, a review of the hearing transcript reveals that the VE did not specifically so state that any of his testimony was based on his education, etc.
        The transcript does reflect, however, that immediately after the VE was sworn and commenced his testimony, the ALJ referenced the VE's resume (Tr. 51, 99), which outlines the VE's education, training, and experience. Moreover, there is nothing in the transcript showing that Plaintiff objected to the VE's qualifications or his testimony. The VE's background rendered him qualified to testify about Plaintiff's ability to perform the positions of food and beverage order clerk, addresser, and stuffer, and the ALJ was entitled to accept that testimony.

Commissioner be ordered to **REMAND** this case to the administrative law judge for further proceedings consistent with this report and recommendation, and that the clerk be directed to **CLOSE** this file.

At Pensacola, Florida, this 29th day of June 2010.


/s/ Elizabeth M. Timothy
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).